UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SPOTLIGHT TICKET MANAGEMENT, INC., *et al.*,<br><br>                              Plaintiffs,<br><br>                    -v-<br><br>JAMES DAIGLE,<br>                              Defendant. | 23-CV-10035 (JPO)<br><br>OPINION AND ORDER |

J. PAUL OETKEN, District Judge:

Plaintiffs Spotlight Ticket Management, Inc. and SSSI Acquisition, Inc. (collectively, "Spotlight") bring this action against Defendant James Daigle—a former Spotlight employee—for breach of contract, breach of the implied warranty of good faith and fair dealing, and tortious interference with prospective business relations. Before the Court is Daigle's motion to dismiss all counts pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons that follow, Daigle's motion to dismiss is granted in part and denied in part.

I.      **Background**

        A.      **Factual Background**

        Unless otherwise noted, the following facts are drawn from Spotlight's complaint and presumed true for purposes of resolving the motion to dismiss. *Fink v. Time Warner Cable*, 714 F.3d 739, 740-41 (2d Cir. 2013).

        Spotlight is a software company that provides "ticket and event management solutions" to corporate clients. (ECF No. 10 ("Compl.") ¶ 22.) Daigle was the President/CEO, founder, and sole shareholder of his former company, Sports Systems, which provided event management, ticketing, and credentialing services to business customers. (*Id.* ¶¶ 27-28.) On April 29, 2023, SSSI —Spotlight's subsidiary—purchased Sports Systems from Daigle to offer a

wider range of event solutions to its clients.  (*Id.* ¶¶ 30-31.)  The acquisition was governed by an Asset Purchase Agreement executed by SSSI and Daigle.  (*Id.* ¶ 2.)

As part of the acquisition, Daigle accepted employment with Spotlight as its Head of Sales, and signed an "Invention Assignment, Confidentiality, Non-Competition, and Non-Solicitation Agreement" (the "Inventions Agreement"), dated April 29, 2021.  (*Id.* ¶ 3.)  Daigle later resigned from Spotlight, leaving the company on February 28, 2023.  (*Id.* ¶ 4.)  On or approximately on February 24, 2023, Daigle signed a "Separation Agreement and General Release" (the "Separation Agreement"), which became effective on March 4, 2023.  (*Id.* ¶¶ 63-64.)

The Asset Purchase, Inventions, and Separation Agreements include restrictive covenants purporting to limit Daigle's business activities.  (*Id.* ¶ 5.)  The Asset Purchase and Inventions Agreements each contain non-competition, non-solicitation, and confidentiality provisions.  (*Id.* ¶ 46-48, 58-59, 61.)  The Separation Agreement purports to reaffirm and incorporate the terms of the prior agreements and includes a warranty that Daigle had been in full compliance with the prior agreements "as of the effective date of the Invention Agreement and the Asset Purchase Agreement, respectively."  (*Id.* ¶ 65.)  The Inventions Agreement and the Separation Agreement also contain non-disparagement provisions.  (*Id.* ¶¶ 61, 66.)  Finally, the Separation Agreement purports to release all then-existing claims against Daigle, "excluding claims arising out of: (i) events, acts, or omissions taking place after the Effective Date of this Agreement; and (ii) claims arising out of Employee's breach of this Agreement, the Invention Agreement, the restrictive covenants contained in the Asset Purchase Agreement . . . arising after the Effective Date of this Agreement."  (ECF No. 15-12 ("Exhibit D") cl. 3.)

On his last day at Spotlight—before the effective date of the Separation Agreement—Daigle posted on LinkedIn that he was opening a new business, Jim Daigle Consulting, to "bring [his] expertise in top-level event technology to the client side of the business." (Compl. ¶ 70.) In a call with a Spotlight client that day, Daigle said that he "would be doing 'the same thing' by bringing his tech experience to the client side, and he encouraged the client to connect with him" on LinkedIn. (*Id.* ¶ 71.) Daigle also set an auto-response from his Spotlight email address instructing recipients that they could reach him via his LinkedIn profile. (*Id.* ¶ 73.)

During the summer of 2023, Spotlight was in the process of responding to a customer's "Request for Proposal" ("RFP"). (*Id.* ¶ 75.) On June 28, 2023, the customer reported to Spotlight that Daigle had reached out to them to discuss the RFP. (*Id.* ¶ 76.) On August 17, 2023, Daigle texted a Spotlight employee, writing that Daigle believed that Spotlight would lose the RFP without significant changes. (*Id.* ¶ 77.) In those texts, Daigle "referenced ideas that he had shared with the customer regarding the same." (*Id.*) Spotlight alleges that it lost the bid, "as a result of Daigle's interference." (*Id.* ¶ 78.)

On October 25, 2023, another customer reported to Spotlight that Daigle had reached to them. (*Id.* ¶ 79.) Daigle told the customer that he "knew there were some issues" with the project the customer was working on with Spotlight and that the customer could hire him to "help with any challenges." (*Id.*) Spotlight also alleges that Daigle contacted at least two other Spotlight customers to solicit them for his "competing" business, and that at least one of those customers "terminated their relationship with Spotlight, in part, as a result of Daigle's interference." (*Id.* ¶ 80.)

Finally, the Complaint alleges that Daigle has applied for roles at one of Spotlight's major customers, which sells Spotlight's services to other businesses, "for the purpose of providing services . . . which would compete with Spotlight . . . ."  (*Id.* ¶ 81.)

**B.    Procedural History**

Spotlight filed its complaint on November 17, 2023 (ECF No. 10), asserting seven counts: breach of the Asset Purchase Agreement (Count I), breach of the implied warranty of good faith and fair dealing in the Asset Purchase Agreement (Count II), breach of the Inventions Agreement (Count III), breach of the implied warranty of good faith and fair dealing in the Inventions Agreement (Count IV), breach of the Separation Agreement (Count V), breach of the implied warranty of good faith and fair dealing in the Separation Agreement (VI), and tortious inference with prospective business relations (Count VII).  Daigle moved to dismiss the complaint (ECF No. 15), and filed an accompanying memorandum of law on February 13, 2024, (ECF No. 16 ("Mem.")).  Spotlight filed its opposition to the motion to dismiss on February 27, 2024 (ECF No. 18 ("Mem. Opp.")), and Daigle filed his reply on March 5, 2024 (ECF No. 19 ("Reply")).

**II.    Legal Standard**

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A complaint need not contain "detailed factual allegations," but it must offer something "more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted).  A plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 555).  In resolving a motion to dismiss, the Court must accept as true all well-pleaded factual allegations

in the complaint, "drawing all reasonable inferences in favor of the plaintiff." *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

## III.    Discussion

### A.    Effects of the Separation Agreement on the Asset Purchase and Inventions Agreements

Daigle argues that the Separation Agreement "incorporates select provisions of the two previous agreements and supersedes them," such that "any breach of contract claim arises only under the Separation Agreement." (Mem. at 8.) Spotlight disagrees, contending that "the Separation Agreement explicitly reaffirms the restrictive covenants contained in [the Asset Purchase and Inventions Agreements], and confirms their continued operation and effect." (Mem. Opp. at 6.) Whether the Separation agreement has superseding effect is significant for choice-of-law purposes: the parties agree that the Asset Purchase Agreement contains a clause selecting Delaware law to govern its terms, but that the Inventions and Separation Agreements contain clauses selecting New York law.

"[A] written agreement that is complete, clear[,] and unambiguous on its face must be interpreted according to the plain meaning of its terms." *Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010) (quoting *Int'l Multifoods Corp. v. Com. Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2002)) (alteration omitted). New York contract law does not permit a court to find a "contract ambiguous where the interpretation urged by one party would 'strain the contract language beyond its reasonable and ordinary meaning." *Id.* (quoting *Bethlehem Steel Co. v. Turner Constr. Co.*, 161 N.Y.S.2d 90, 93 (1957)) (alteration omitted). That is true even if an isolated clause appears ambiguous when considered on its own, because if "consideration of the contract as a whole will remove the ambiguity created by a particular

clause, there is no ambiguity. *Readco, Inc. v. Marine Midland Bank*, 81 F.3d 295, 300 (2d Cir. 1996) (citing *Hudson-Port Ewen Assocs., L.P. v. Chen Kuo*, 573 N.Y.S.2d 637 (1991)).

In conducting this analysis, "[t]he best evidence of what parties to a written agreement intend is what they say in their writing." *Greenfield v. Philles Recs. Inc.*, 750 N.Y.S.2d 565, 569 (2002) (quoting *Slamow v. Del Col*, 584 N.Y.S.2d 424, 425 (1992)). Where "the agreement on its face is reasonably susceptible of only one meaning," the analysis is at its end. *Id.* at 569-70. The contested portion of the Separation Agreement is Clause 13, which reads:

> **13.    Entire Agreement**.    The parties acknowledge and agree that this Agreement, together with Employee's SIRA and the Reaffirmed Obligations (each of which shall survive the execution of this Agreement and shall remain binding on Employee in accordance with their terms), constitutes the full and entire understanding and agreement between the parties with regard to the subject matter hereof, and the terms and conditions contained herein shall inure to the benefit of, and be binding upon, the heirs, representatives, successors and assigns of each of the parties thereto.    For the avoidance of doubt, by entering into this Agreement, the parties hereby confirm that the Employee's Executive Employment Agreement (but not the Invention Agreement) is hereby terminated as of the Effective Date. All representations, recitals, and warranties contained in this Agreement are binding and shall survive its execution, effectiveness, and delivery.

(Exhibit D.)  Also relevant, by virtue of its incorporation in Clause 13, is the portion of the Separation Agreement concerning "Reaffirmed Obligations," which is defined in Clause 6(c):

> By executing this Agreement, Employee reaffirms and agrees to abide by the terms of Employee's Invention Assignment, Confidentiality, Non-Competition and Non-Solicitation Agreement (the "Invention Agreement"), including, without limitation, the non-competition, non-solicitation and confidentiality terms thereof, and the restrictive covenants contained in the Asset Purchase Agreement between SSSI Acquisition, LLC, SSSI, and Employee ("Asset Purchase Agreement") (collectively, the "Reaffirmed Obligations"), which Reaffirmed Obligations are all fully incorporated by reference into this Agreement as if fully set forth herein.

(*Id.*)  Daigle argues that the portion of Clause 13 which states that the Separation Agreement "constitutes the full and entire understanding and agreement between the parties with regard to the subject matter hereof" supersedes the prior agreements, including their choice-of-law

provisions.  (Mem. at 8 & n.1.)  But as Spotlight points out, Clause 13 states explicitly that the "Reaffirmed Obligations," which include the Asset Purchase and Inventions Agreements, "shall survive the execution of this Agreement and shall remain binding on Employee in accordance with their terms."

Only Spotlight's reading is a reasonable interpretation of the text of the agreement. Reading Clauses 6 and 13 together, as the Court is required to do under New York law, the parties explicitly agreed to *remain bound* by the Asset Purchase and Inventions Agreements. Whether the proper construction is that the Asset Purchase and Inventions Agreements were "incorporated" into the Separation Agreement—bringing their choice-of-law provisions along with them—or whether the three contracts are independent, does not change the analysis, since the plain meaning of the Separation Agreement preserves the obligations from the prior contracts.  Reaffirming prior agreements is not unusual in corporate contracting.  *See, e.g.*, *Lee v. Joseph E. Seagram & Sons, Inc.*, 552 F.2d 447, 452 (2d Cir. 1977) ("Collateral agreements which survive the closing of a corporate deal, such as employment agreements for particular shareholders of the seller or consulting agreements, are often set forth in separate agreements.") Because there is no reasonable interpretation of the Separation Agreement as superseding the Asset Purchase and Inventions Agreements, the Court rejects Daigle's argument that the entire dispute is governed by the Separation Agreement and its choice-of-law provision.

### B.    Spotlight's Alleged Breach of the Separation Agreement

Daigle argues next that the Separation Agreement is unenforceable by Spotlight because it breached Clause 3 of that contract, which purports to release Daigle

> from all liabilities, claims, causes of action, charges, complaints, grievances, obligations, costs, losses, liens, damages, injuries, attorneys' fees, and other legal responsibilities . . . but excluding claims arising out of: (i) events, acts or omissions taking place after the Effective Date of this Agreement; and (ii) claims arising out of Employee's breach of this Agreement, the Invention Agreement, the restrictive

> covenants contained in the Assert Purchase Agreement (as defined in Section 6(c)), or (iii) claims for indemnification in connection with any Third Party Claim pursuant to the Asset Purchase Agreement, in each case arising after the Effective Date of this Agreement (hereinafter referred to as the "Employer Claims", and together with the Employee Claims, the "Claims").

(Exhibit D (underlining in original).)  The parties agree that the Separation Agreement became effective on March 4, 2023.  (Mem. at 9; Mem. Opp. at 8.)  And the parties also agree that the release does not bar claims arising under the Asset Purchase, Inventions, or Separation Agreements arising after March 4, 2023.  (Mem. at 9-10; Mem. Opp. at 8-9.)  But Daigle argues that Spotlight included claims from the purportedly released period in the complaint, thus breaching the Separation Agreement and barring Spotlight from enforcing that contract.  Spotlight responds that the allegations from the purportedly released period were included in the complaint "solely for the purpose of providing context regarding the competitive nature of Defendant's new business venture."  (Mem. Opp. at 8.)  Alternatively, Spotlight argues that even if the inclusion of those allegations constituted a breach, it was not "a material breach . . . precluding enforcement of the restrictive covenants set forth in the Separation Agreement."  (*Id.* at 9.)

First, Spotlight is correct that "Defendant does not (and cannot) argue that Plaintiff['s] Complaint constitutes a breach of the [Asset Purchase] and/or Inventions Agreement[s]."  (Mem. Opp. at 9 n.4.)  Thus, Daigle's argument about the allegedly breached release is at best a defense to enforcing the Separation Agreement, but not the prior contracts.  And as already established, the Asset Purchase and Inventions Agreements were not replaced by the Separation Agreement.

Second, even as to the Separation Agreement, Daigle is incorrect that the inclusion of allegations from before March 4, 2023, constitutes a breach of the Separation Agreement's release.  Under New York law, a party is excused from performing according to the terms of a

contract "where the other party's breach of the contract is so substantial that it defeats the object of the parties in making the contract." *Frank Felix Assocs., Ltd. v. Austin Drugs, Inc.*, 111 F.3d 284, 289 (2d Cir. 1997).  But a defendant may raise that defense only if the alleged breach by the plaintiff occurred *before* the alleged breach by the defendant.  In a case like this, "a subsequent breach by Party B to a contract does not excuse a prior breach by Party A." *Evolution Markets, Inc. v. Alpental Energy Partners, LLC*, 221 F. Supp. 3d 361, 370 (S.D.N.Y. 2016).  Instead, the Court is to "look[] to the situation at the time of [the defendant's] breach." *Id.* at 371.  If, "[a]t that moment, [the defendant] had done nothing at all to breach the contract," there is no defense to enforcement, since there had been "no justification" for the prior breach. *Id.*  "A subsequent breach . . . might offset any damages suffered from [the defendant's] earlier breach, but it does not excuse [the defendant's] prior behavior." *Id.*

Third, even if Daigle could cast the pre-March 4, 2023, allegations in the complaint as breaches of the Separation Agreement's release, any such breach would not be material as a matter of law sufficient to preclude Spotlight from enforcing the contract.  "Under New York law, a party's performance under a contract is excused where the other party has substantially failed to perform its side of the bargain or, synonymously, where that party has committed a material breach." *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 186 (2d Cir. 2007) (citing *Hadden v. Consol. Edison Co. of N.Y.*, 356 N.Y.S.2d 249 (1974)).  "The issue of whether a party has substantially performed is usually a question of fact and should be decided as a matter of law only where the inferences are certain." *Id.* at 186-87 (citing *Anderson Clayton & Co. v. Alanthus Corp.*, 457 N.Y.S.2d 578 (2d Dep't 1983)).  Spotlight makes a compelling argument that its inclusion of pre-March 4, 2023, allegations, even if technically breaches, were not materially so, since Daigle still "received and retained 'substantial and valuable

consideration'" from the agreement (Mem. Opp. at 9), especially given Spotlight's clarification that the allegations are mere context, rather than independent claims.  Regardless, whether the text of the complaint counts as a material breach, notwithstanding the first two defects with Daigle's argument, is a question of fact that cannot be determined on the pleadings alone.

Accordingly, the Court rejects Daigle's argument that the inclusion of pre-March 4, 2023, allegations in the Complaint constituted a material breach of the Separation Agreement that prevents Spotlight from enforcing it.

### C.    Breach of Contract

Daigle argues next that the Complaint should be dismissed because Spotlight does not plead a plausible breach of contract.  "To state a claim in federal court for breach of contract under New York law, a complaint need only allege (1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages."  *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996) (citing *Tagare v. Nynex Network Sys. Co.*, 921 F. Supp. 1146, 1149 (S.D.N.Y. 1996)); *see also Edwards v. Sequoia Fund, Inc.*, 938 F.3d 8, 12 (2d Cir. 2019) (quoting *Orlander v. Staples, Inc.*, 802 F.3d 289, 294 (2d Cir. 2015)).  Similarly, under Delaware law, "to survive a motion to dismiss for failure to state a breach of contract claim, the plaintiff must demonstrate: first, the existence of the contract, whether express or implied; second, the breach of an obligation imposed by that contract; and third, the resultant damage to the plaintiff."  *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003) (citing *Winston v. Mandor*, 710 A.2d 835, 840 (Del. Ch. 1997)).  Daigle contends that Spotlight has not plausibly alleged breach, and that any potential breach did not cause the harm Spotlight alleges.  (Mem. at 8-16.)

10

Spotlight has plausibly alleged at least that Daigle breached the non-competition clauses of the Asset Purchase and Inventions Agreements, incorporated into and reaffirmed by the Separation Agreement.  The relevant text of those agreements follows:

- **Asset Purchase Agreement:** "For the period from the Closing Date to the fifth anniversary of the Closing Date (the "Restricted Period"), each seller Party . . . shall not, directly or indirectly, own, manage, consult with, advise, operate, market or control, or participate in the ownership, management, consultation, advising, operation, marketing or control of, any Person, product or service anywhere in the world that competes with the Business as existing as of the Closing Date . . . ."  (ECF No. 15-9 ("Exhibit A") cl. 7.1.)

- **Inventions Agreement:** "[D]uring the Restriction Period (as defined below), I shall not, whether as an employee, agent, consultant, advisor, independent contractor, proprietor, partner, officer, director, joint venturer, trustee, executive, investor, lender or guarantor of any corporation, partnership or other entity, or in any other capacity, directly or indirectly (on my own behalf or on behalf of or through any other person or entity) . . . in the Territory (as defined below) engage in a Competitive Business (as defined below), otherwise become involved with a Competitive Business or make preparations to provide assistance to any Competitive Business or to form, invest in, operate, finance or control a Competitive Business, including but not limited to any research, development or other efforts aimed at ultimately benefiting a Competitive Business . . . "Restriction Period" means the period of my employment with the Company and its affiliates and, for purposes of Section 10.1(a) above the twelve (12) month period, and for purposes of Sections 10.1(b) and 10.1(c) above, twenty-four (24) month period, immediately following the termination of such employment for any reason, provided that each such applicable period shall be automatically extended for any time that I am in violation of this Section 10; and "Territory" means the State of New York, the State of New Jersey, the State of Connecticut, the rest of the United States of America and any other country or jurisdiction worldwide where the Company and its affiliates conduct business or has conducted business at the time of the termination or cessation of my employment relationship for any reason."  (ECF No. 15-11 ("Exhibit C") cls. 10.1-10.2.)

The parties agree that Daigle's acts before March 4, 2023, are not independently actionable under either agreement because of the terms of the release in the Separation Agreement.  But that does not make those allegations irrelevant.  Rather, Plaintiffs explain that the "paragraphs describing certain conduct by Defendant prior to March 4, 2023, . . . are solely for the purpose of providing context regarding the competitive nature of Defendant's new business venture."  (Mem. Opp. at 8.)  For instance, if Daigle had announced on March 3, 2023, "I am going to open a business to compete with Spotlight," and then on March 5, 2023, started a

new business, Daigle's prior statement would be *relevant* to determining the nature of the new

business, even though it would not be independently *actionable*.

Though Spotlight's specific allegations of Daigle's competitive conduct are sparse, they

suffice to state a claim for breach of contract.  Central to all of Spotlight's allegations is Daigle's

creation of "a competing consulting business" to which Daigle "began soliciting Spotlight's

customers before his Separation Agreement was even finalized."  (Compl. ¶ 69.)  Spotlight

alleges that around February 28, 2023, "Daigle posted on LinkedIn that he was 'opening Jim

Daigle Consulting' 'to bring [his] expertise in top-level event technology to the client side of the

business.'"  (*Id.* ¶ 70) (alteration in original).)  Spotlight also alleges that "Daigle began

advertising his competing consulting business to, and soliciting, Spotlight's customers and

prospective customers, before his employment with the Company was terminated, *and still*

*continues to do so*."  (*Id.* ¶ 71 (emphasis added).)  In one of those conversations, "during a

transition call with a Spotlight customer and another Spotlight employee, Daigle told the

customer that after he left Spotlight he would be doing 'the same thing' by bringing his tech

experience to the client side, and he encouraged the client to connect with him via his LinkedIn

profile (which contained the post regarding his competing business)."  (*Id.* ¶ 72.)  To further

encourage LinkedIn connections, "on or about February 28, 2023, . . . Daigle set up an auto-

response for e-mails sent to his Spotlight e-mail address (including e-mails from customers and

clients), which instructed recipients of the auto-response to reach him via his LinkedIn profile."

(*Id.* ¶ 73.)

Spotlight alleges that since the effective date of the Separation Agreement (and the end of

the release period), Daigle "has contacted clients and customers of Spotlight for the purposes of

soliciting his competing business, diverting business away from Spotlight, and/or encouraging or

advising clients and customers of Spotlight to terminate, reduce, or otherwise modify their relationship with Spotlight."  (*Id.* ¶ 74.)  In one such instance, Daigle "reached out to discuss" a Spotlight customer's Request for Proposal ('RFP') (*id.* ¶ 76), and "as a result of Daigle's interference, Spotlight['s] . . . bid in response to the RFP had been rejected, resulting in a loss of annual revenue to Spotlight" (*id.* ¶ 78).  Later that year, Daigle also allegedly suggested to a Spotlight customer "that he 'knew there were some issues'" with their ongoing project with Spotlight "and that the customer could hire him to 'help with any challenges' they were experiencing with Spotlight."  (*Id.* ¶ 79.)  Finally, Spotlight alleges that Daigle has "solicit[ed] his competing consulting business" to "at least two other customers of Spotlight" (including "at least one" who "terminated their relationship with Spotlight, in part, as a result of Daigle's interference") and "applied for roles at one of Spotlight's major customers . . . for the purpose of providing services to that customer . . . which would compete with Spotlight."  (*Id.* ¶¶ 80-81.)

Viewing Daigle's post-March 4, 2023, activities in the context of the allegations about pre-March 4, 2023, activities, the Court concludes that Spotlight has pleaded a plausible breach of the non-competition clauses included in the Asset Purchase and Inventions Agreements.  With the factual allegations taken as true, it is reasonable to infer (1) that Daigle operated a business on the client side of Spotlight's industry after March 4, 2023; (2) that Daigle marketed that business to Spotlight's existing and potential customers; and (3) that providing services on the client side would reduce the need for those customers to purchase services directly from Spotlight.  In fact, the contrary inference—that Daigle must have suddenly ceased the allegedly competitive business activity at 12:01 a.m. on March 4, 2023—is less plausible by comparison.  As a result, Spotlight has also pleaded a plausible breach of the Separation Agreement, which incorporates—in addition to reaffirming—the obligations of the Asset Purchase and Inventions

Agreements. Though Spotlight has not yet adduced specific proof of causation, the Court must make reasonable inferences in Daigle's favor at this stage, including the reasonable inference that encouraging performing "the same" services to Spotlight's customers would reduce their business with Spotlight directly.

Daigle argues for a different interpretation of the same events. Specifically, he claims that his communications to Spotlight's customers were him "pitching himself as a facilitator, who could help clients work with Spotlight and better achieve the goals of all the parties." (Mem. at 13.) Daigle also refers to text messages purporting to be between Daigle and Spotlight employees demonstrating Daigle's willingness to help the company. (*Id.* at 1, 5, 7, 12, 13.) But at this stage, the Court is required to take Spotlight's allegations to be true, not Daigle's. Whether or not Daigle was working to help Spotlight as described, and whether or not that help continued during the entire post-release period, are questions of fact that cannot be resolved on the pleadings alone.

Accordingly, Daigle's argument for dismissal of the complaint on the grounds of insufficient factual allegations fails.

**D.    Whether the Restrictive Covenants are Unenforceable and Whether the Plaintiffs are Entitled to "Blue-Penciling"**

Daigle argues next that the restrictive covenants in the Asset Purchase, Inventions, and Separation Agreements are unenforceable, and that Spotlight is not entitled to judicial modification of the contracts (or "blue penciling") because Spotlight did not request that remedy. (Mem. at 18.) Under New York law—which governs the Inventions and Separation Agreements—restrictive covenants must be "reasonable," which requires that the agreement be "reasonable in time and area, necessary to protect the employer's legitimate interests, not harmful to the general public and not unreasonably burdensome to the employee." *JLM Couture,*

*Inc. v. Gutman*, 91 F.4th 91, 106 (2d Cir. 2024) (quoting *BDO Seidman v. Hirschberg*, 93

N.Y.2d 382, 389 (1999)).  Under Delaware law—which governs the Asset Purchase Agreement

that arose from the sale of Daigle's business—an enforceable non-competition agreement "must

(1) be reasonable in geographic scope and temporal duration, (2) advance a legitimate economic

interest of the party seeking its enforcement, and (3) survive a balancing of the equities," and

"[w]here a sale of a business is not involved, courts should be less prone to enforce such

covenants."  *Cameron Int'l Corp. v. Abbiss*, No. 16-CV-2117, 2016 WL 5394312, at *2 (S.D.

Tex. 2016) (citing cases applying Delaware law); *see also FP UC Holdings, LLC v. Hamilton*,

No. 2019-1029, 2020 WL 1492783, at *6 n.40 (Del. Ch. Mar. 27, 2020) (collecting cases

approving of restrictive covenants in the context of the sale of a business).

Because assessing the reasonableness of a restrictive covenant is such a fact-bound

inquiry, courts ordinarily do not determine their enforceability on motions to dismiss.  *See*

*Installed Bldg. Prods., LLC v. Cottrell*, No. 13-CV-1112, 2014 WL 3729369, at *8 (W.D.N.Y.

July 25, 2014) ("As should be obvious, these are all questions that can only be answered based

on a more fully[]developed record.  Accordingly, the Court cannot conclude that the non-

compete agreement is unenforceable as a matter of law.").  That is true under New York law, *see*

*Twitchell Tech. Prods., LLC v. Mechoshade Sys., LLC*, 208 N.Y.S.3d 657, 671 (2d Dep't 2024)

("[A]s with overly broad restrictive covenants in employment agreements, in order to determine

whether an overly broad restrictive covenant in an ordinary commercial agreement is capable of

partial enforcement, courts should conduct a case specific analysis, which likely requires a more

developed record than is available at this stage of the litigation.") (citing *BDO Seidman*, 93

N.Y.2d at 394), and Delaware law, *see Vogel v. Boris*, No. 20-CV-9301, 2021 WL 1668072, at

*7 (S.D.N.Y. Apr. 28, 2021) (collecting cases declining to decide the reasonableness of a

restrictive covenant, including some under Delaware law, at the pleadings stage).  As Spotlight

points out, "none of the cases cited by Defendant were decided on a motion to dismiss, but rather

on a motion for summary judgment following discovery . . . [or] a motion for a preliminary

injunction."  (Mem. Opp. at 14, n.11.)

Daigle argues that the restrictive covenants in this case are *per se* unenforceable, and thus

the Court should refuse to enforce them on the pleadings alone.  (Mem. at 16-18.)  In particular,

Daigle argues that the clauses are "impermissibly broad" because they restrict his ability to

"perform[] any consultation or advising with any entity that allegedly competes with Plaintiffs,"

which "would prevent Daigle from performing services that themselves would not be

competitive to Plaintiffs."  (*Id.* at 16.)  Daigle points primarily to *BDO Seidman v. Hirschberg*, in

which the New York Court of Appeals held that a former employee could not be restricted from

serving *any* of their former employer's clients without regard to whether the employee had

formed a relationship with the client prior to leaving the employer.  93 N.Y.2d at 393 ("To the

extent . . . that [the Agreement prohibits competition for clients] with whom [the defendant]

never acquired a relationship through the direct provision of substantive . . . services during his

employment, the covenant is invalid and unenforceable.").[1]  Daigle argues that *BDO Seidman*'s

rule renders the non-competition clause in his contracts with Spotlight "overbroad as a matter of

New York law."  (Mem. at 17-18 (collecting cases applying the *BDO Seidman* rule).)

---

[1] More precisely, the contract in *BDO Seidman* did not "expressly bar [the defendant] from serving [the plaintiff's] clients.  Instead, it require[d] him to 'pay for the loss and damages' sustained by [the plaintiff] in losing any of its clients to defendant within 18 months after his departure."  *BDO Seidman*, 93 N.Y.2d at 388.  The Court of Appeals thought it nevertheless straightforward to consider the contract as a restrictive covenant, writing, "it is not seriously disputed that the agreement, in its purpose and effect, is a form of ancillary employee anti-competitive agreement that will be carefully scrutinized by the courts."  *Id.* (citation omitted).

As a starting matter, *BDO Seidman*—an explication of New York's law concerning employee non-competition agreements—does not govern the Asset Purchase Agreement, both because that contract was ancillary to the sale of a business (which Daigle does not dispute) and because it is governed by Delaware law.[2]  Daigle has not made any arguments that the Asset Purchase Agreement is *per se* unreasonable under Delaware law, and thus the Court may not at this stage dismiss claims arising under that contract on that basis.

That leaves the Inventions and Separation Agreements, both of which contain choice-of-law clauses selecting New York law.  Daigle is correct that analysis of restrictive covenants under New York law often begins with *BDO Seidman*, which invalidated portions of a non-competition agreement that prevented a former employee from working with clients with whom the employee had not interacted while working for the former employer.  93 N.Y.2d at 393.  And courts applying New York law do typically treat *BDO Seidman* as something of a brightline rule. *See, e.g.*, *Permanens Capital L.P. v. Bruce*, No. 21-CV-2022, 2022 WL 3442270, at *11 (S.D.N.Y. July 22, 2022) (holding that a non-competition clause barring a former employee from

---

[2] Daigle's only argument that New York law governs all three contracts is his contention that the Separation Agreement superseded the prior agreements.  Daigle does not argue that New York courts would refuse to enforce the restrictive covenant contained in the Asset Purchase Agreement—which nevertheless selects Delaware law to govern—as a matter of public policy. Therefore, the Court need not determine whether choice-of-law principles prevent the application of Delaware law to enforce the Asset Purchase Agreement.  *See Medtronic, Inc. v. Walland*, No. 21-CV-2908, 2021 WL 4131657, at *5 (S.D.N.Y. Sept. 10, 2021) ("Albeit in a summary order, the Second Circuit noted that, while *Ministers* held that New York courts generally honor a choice-of-law provision, the Court of Appeals did not have cause to address the status of prior law recognizing that the parties' choice of law must yield to a conflicting law reflecting the fundamental public policy of a state with a materially greater interest in the dispute than the chosen state.  In *Ministers*, neither party contested that the choice-of-law provision in the contract meant that New York law applied to the case, meaning that the Court of Appeals had no reason to examine any potential exceptions that barred the application of the choice-of-law provision." (quotation marks and internal citation omitted) (citing and quoting *Capstone Logistics Holding, Inc. v. Navarrete*, 736 F. App'x 25, 26 (2d Cir. 2018) (summary order)).

dealing with the employer's "entire client base" was "overbroad"); *QBE Americas, Inc. v. Allen*, No. 22-CV-756, 2022 WL 889838, at *14 (S.D.N.Y. Mar. 25, 2022) (similar); *Good Energy, L.P. v. Kosachuk*, 853 N.Y.S.2d 75, 77 (1st Dep't 2008) ("[T]he covenant not to compete is unreasonable because it purports to prohibit defendant from dealing with Good Energy's entire client base, thus including not only those clients or customers that had been created and maintained at Good Energy's expense, but also those clients that were not serviced by defendant during his tenure at Good Energy . . . .").

However, that Spotlight seeks an application of the Inventions and Separation Agreements that might preclude Daigle from competing for clients with whom he did not work while at Spotlight does not end the analysis.  Instead, *BDO Seidman* by its own terms permits courts to narrow restrictive covenants to render them reasonable enough to enforce.  *See Beth Israel Med. Ctr. V. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 581 (2d Cir. 2006) ("Where part of a contract is contrary to public policy, and therefore unenforceable, a court may nevertheless enforce the remainder of the contract.") (citing *BDO Seidman*, 93 N.Y.2d. at 382)); *see also QBE Americas, Inc.*, 2022 WL 889838, at *15 ("[T]he Court concludes that [the plaintiff] will likely succeed in proving that a portion of the . . . non-solicitation covenant is enforceable, provided that the numerous aspects of overbreadth discussed above are carved out. And there is no question that the Court would be authorized to 'blue pencil' the covenant to enforce only those portions that protect a legitimate business interest. (citing *BDO Seidman*, 93 N.Y.2d at 394)); *Int'l Bus. Machs. Corp. v. Lima*, 833 Fed. App'x 911, 912 (2d Cir. 2021) (summary order) (noting the potential for narrowing overbroad restrictive covenants under *BDO Seidman*).

Daigle does not dispute that *BDO Seidman* permits severing overbroad restrictive covenants. Instead, he argues that Spotlight has not satisfied *BDO Seidman*'s requirements for severance, or "blue penciling," pointing to a paragraph toward the end of that opinion:

> The prevailing, modern view rejects a *per se* rule that invalidates entirely any overbroad employee agreement not to compete. Instead, when, as here, the unenforceable portion is not an essential part of the agreed exchange, a court should conduct a case specific analysis, focusing on the conduct of the employer in imposing the terms of the agreement. Under this approach, if the employer demonstrates an absence of overreaching, coercive use of dominant bargaining power, or other anti-competitive misconduct, but has in good faith sought to protect a legitimate business interest, consistent with reasonable standards of fair dealing, partial enforcement may be justified.

93 N.Y.2d at 394 (citations omitted). Daigle takes that language to impose an affirmative pleading requirement, insisting that a plaintiff seeking to enforce a restrictive covenant "plead[] . . . an absence of overreaching [or] coercive use of dominant bargaining power[,] or show that it has in good faith sought to protect a legitimate business interest." (Mem. at 18 (quotation marks omitted).) *BDO Seidman* imposes no such rule. Instead, the Court of Appeals' "flexible position," 93 N.Y.2d at 394, contemplates the development of a record regarding the parties' relationship and industry. *See Brown & Brown, Inc. v. Johnson*, 25 N.Y.3d 364, 371 (2015) ("[O]n this record and at this early stage of the action when little discovery has taken place, dismissal [under the *BDO Seidman* standard] of the portion of the breach of contract claim based on the non-solicitation provision in the employment agreement is inappropriate.").

Because the contracts Spotlight seeks to enforce are not *per se* unenforceable, it would be inappropriate to dismiss the action at this stage without affording the parties an opportunity to develop facts relevant to the reasonableness of the contracts and potential severability of overbroad portions.

E.    **Whether the Implied Duty Claims are Duplicative**

Daigle moves next to dismiss Counts II, IV, and VI—which assert claims for breaches of the implied covenant of good faith and fair dealing in the Asset Purchase, Inventions, and Separation Agreements—as duplicative of the breach of contract claims. Daigle is correct that a claim of breach of the implied covenant of good faith and fair dealing that is *purely* duplicative of a straightforward breach of contract claim should be dismissed. *See Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 146 (Del. Ch. 2009) ("The implied covenant of good faith and fair dealing . . . does not apply when 'the subject at issue is expressly covered by the contract.'" (quoting *Dave Greytak Enters., Inc. v. Mazda Motors of Am., Inc.*, 622 A.2d 14, 23 (Del. Ch. 1992), *aff'd*, 602 A.2d 668 (Del. 1992)); *Harris v. Provident Life & Acc. Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002) ("New York law . . . does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled.").

Spotlight attempts to preserve the good faith and fair dealing claims on the basis of two arguments: first, that the parties' course of performance and dealing created reasonable expectations about Daigle's non-competition with Spotlight, and second, that the issue is one of fact that cannot be resolved on a motion to dismiss. (Mem. Opp. at 24–25.) Neither argument is availing. As to the course of performance and dealing, Spotlight does not establish any expectation beyond Daigle's compliance with the terms of the contracts as written. And where, as here, Spotlight seeks to enforce restrictive covenants against a former employee, it would subvert New York and Delaware law to permit the employer to use the good faith and fair dealing covenant to broaden the terms of restrictive covenants beyond the maximal extent of those agreements that the reasonableness standards afford. *See Lodging Sols., LLC v. Miller*, No. 19-CV-10806, 2020 WL 6875255, at *9 (S.D.N.Y. Nov. 23, 2020) (dismissing a claim based on

the implied covenant of good faith and fair dealing where the underlying restrictive covenant was unenforceable); *Hadami, S.A. v. Xerox Corp.*, 272 F. Supp. 3d 587, 598 (S.D.N.Y. 2017) (similar).  Spotlight's second argument, the unadorned proposition that "the determination of whether conduct violates the implied covenant is a question of fact" (Mem. Opp. at 25), does not rescue the claims, since the defect is that no such implied covenant exists to cover the alleged conduct in the first place.

Accordingly, Daigle's motion to dismiss Counts II, IV, and VI is granted.

### F.    Tortious Interference Claim

Finally, Daigle moves to dismiss Count VII, which asserts a claim for tortious interference with prospective business relations.  Daigle argues that the claim is duplicative of the breach of contract claims, that Spotlight has failed to plead the required element of tortious interference, that Spotlight fails to identify a business relationship with which Daigle allegedly interfered, and that Spotlight fails to allege causation.  (Mem. at 21-24.)

To state a claim for tortious interference with prospective business relations under New York law, the Complaint must allege that "(i) the plaintiff had business relations with a third party; (ii) the defendants interfered with those business relations; (iii) the defendants acted for a wrongful purpose or used dishonest, unfair, or improper means; and (iv) the defendants' acts injured the relationship."  *Scutti Enters., LLC v. Park Place Entm't Corp.*, 322 F.3d 211, 215 (2d Cir. 2003) (quoting *Lombard v. Booz–Allen & Hamilton, Inc.*, 280 F.3d 209, 214 (2d Cir.2002)).

In the complaint, Spotlight does not allege any additional facts—beyond those giving rise to potential contract liability—as supporting its argument that Daigle *wrongfully* interfered.  Instead, in its memorandum opposing the motion to dismiss, Spotlight points to a string of cases for the proposition that it is "well-settled" that "'wrongful means' sufficient to state a claim for tortious interference with prospective business relations can include . . . (i) soliciting customers

21

in violation of a non-solicitation agreement . . . (ii) misappropriating confidential business information . . . or (iii) making false statements or misrepresentations, or otherwise undermining the plaintiffs' reputation and goodwill." (Mem. Opp. at 23.) For the most part, the cases Spotlight cites do not support its theory of tort liability here, and some of the cases actively cut against it. Though a few opinions use broad language to describe wrongful means, their holdings and citations to the New York courts reveal a high bar: To prevail, plaintiffs must make a plausible showing of an independent crime or tort, an action taken solely out of malice, or extreme and unfair economic pressure. *Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 191-94 (N.Y. 2004). None are present here.

First are Spotlight's cases concerning breach of fiduciary duty. It is notable at the outset that the complaint does not allege a breach of fiduciary duty, and Spotlight's memorandum in opposition to the motion to dismiss does not cite the record to support the accusation. (Mem. Opp. at 24.) In any event, mere breach of fiduciary duty is insufficient to support a claim for tortious interference with prospective business relations, and the cases on which Spotlight relies show why. For starters, *Mercer Health & Benefits LLC v. DiGregorio* did not involve a claim for tortious interference with prospective business relations, but for breach of fiduciary duty itself, along with unfair competition and misappropriated confidential information. 307 F. Supp. 3d 326, 354 (S.D.N.Y. 2018). *Catskill Development, L.L.C. v. Park Place Entertainment Corp.*, though concerning the tort claim at issue here, involved more than mere "breach of fiduciary duty"—which the Court did not hold was alone sufficient—but also fraud and economic pressure. 547 F.3d 115, 132-33 (2d Cir. 2008).

*Poller v. BioScrip, Inc.* is similarly inapposite; while that case does not preclude a finding of wrongfulness as a result of a breach of fiduciary duty, it required that breach constitute fraud

or misrepresentation.  974 F. Supp. 2d 204, 237 (S.D.N.Y. 2013) ("[A] knowing breach of fiduciary duty may also, if it satisfies the usual common law elements, amount to a fraud or misrepresentation." (quoting *Hannex Corp. v. GMI, Inc.*, 140 F.3d 194, 206 (2d Cir. 1998) (cleaned up)).  *Poller* then reiterated the well-founded rule: "For Defendants' interference to constitute the kind of wrongful means that will support Plaintiff's claim for tortious interference, one of the following must be true: (1) that conduct must amount to an independent crime or tort; (2) that conduct must have been taken solely out of malice; or (3) that conduct must amount to extreme and unfair economic pressure." *Id.* at 237 (quoting *Friedman & Coldwater Creek, Inc.*, 551 F. Supp. 2d 164, 170 (S.D.N.Y. 2008), *aff'd*, 321 Fed. Appx. 58 (2d Cir. 2009) (cleaned up)).  Moreover, also from *Poller*, "a plaintiff must 'demonstrate *both* wrongful means *and* that the wrongful acts were the *proximate cause* of the rejection of the plaintiff's proposed contractual relations.'" *Id.* at 237 (quoting *State St. Bank & Trust Co. v. Inversiones Errazuriz Limitada*, 374 F.3d l158, 171-72 (2d Cir. 2004) (emphasis in original)).  *Hannex*, cited in *Poller*, stands for essentially the same rule: though breach of a fiduciary duty may constitute "wrongful means," it must "amount to a fraud or misrepresentation."  104 F.3d at 206 (collecting cases).

Spotlight is correct that *Don Buchwald & Associates, Inc. v. Marber-Rich* does say in one sentence, without qualification, that breach of fiduciary duty may constitute tortious interference with prospective business relations.  11 A.D.3d 277, 279 (1st Dep't 2004).  But for that proposition the court cited two cases: *American Baptist Churches v. Galloway*, in which the First Department permitted a tortious interference with prospective *contractual* relations to proceed, 271 A.D.2d 92, 100 (1st Dep't 2000), and *Guard-Life Corp. v. Parker Hardware Manufacturing Corp.*, also a case about interference with contractual relations but which makes no mention of fiduciary duty, 50 N.Y.2d 183 (N.Y. 1980).  And pointedly, the Court of Appeals in *Guard-Life*

found there to be no enforceable contract, so it fell back to the more stringent standard for wrongfulness in the tortious interference with *prospective business relations* context, explaining: "inasmuch as the alleged interference on this branch of the case was with respect to an unenforceable contract, there is no liability in tort unless the means employed to effect the interference was wrongful; mere knowing persuasion would not be sufficient." *Id.* at 196.  The Court of Appeals concluded that the plaintiff had not carried that burden: "There was no proof tendered of any wrongful means—persuasion and offer of better terms, yes; fraud, misrepresentation, threats, other wrongful conduct, no." *Id.* at 196.

Next is the use of confidential information.  But much like breach of fiduciary duty, mere use of confidential information does not constitute tortious interference, since mere disclosure is not itself a crime or tort.  On this score, Spotlight gets the closest with *Cardiocall, Inc. v. Sterling*, 492 F. Supp. 2d 139 (E.D.N.Y. 2007).  But that case, too, is unavailing.  There, Judge Wexler explained: "the knowing use of trade secret or other confidential information has been held to be the sort of tortious conduct necessary to state a claim." *Id.* at 153.  But the two cases Judge Wexler cited for that seemingly broad rule illustrate its narrowness: *Volt Delta Resources LLC v. Soleo Communications, Inc.*, which was a *contract* inference case and turned on an alleged misrepresentation, 816 N.Y.S.2d 702 (N.Y. Sup. Ct. 2006); and *Fonar Corp. v. Magnetic Resonance Plus, Inc.*, which involved not just use of confidential information, but "industrial spying."  957 F. Supp. 477, 482 (S.D.N.Y. 1997).  Like before, more than mere disclosure of confidential information—especially something as vague as "I knew there were issues"—is needed to constitute tortious interference.

Finally, Spotlight points the Court to four cases for the proposition that "making false statements or misrepresentations, or otherwise undermining the plaintiffs' reputation and

goodwill," may constitute tortious interference.  (Mem. Opp. at 23.)  But Spotlight does not allege that Daigle made a false statement to anyone.  Whatever "otherwise undermining . . . reputation and goodwill" means, it is not—without more—tortious interference. *LivePerson, Inc. v. 24/7 Customer, Inc.* involved the provision of "inaccurate business performance data regarding LivePerson to LivePerson's clients," along with the use of technology used to suppress the plaintiff's business.  83 F. Supp. 3d 501, 517 (S.D.N.Y. 2015). *PKG Group, LLC v. Gamma Croma, S.p.A.* similarly involved "false statements . . . [to] covertly undercut [Plaintiff's] image and reputation."  446 F. Supp. 2d 249, 251 (S.D.N.Y. 2006) (cleaned up).  And the court cautioned that those allegations were "sufficient, *albeit barely*," to proceed past a motion to dismiss—and that was before *Twombly* and *Iqbal* were decided.  *See id.* at 252 (emphasis added).  In *North State Autobahn, Inc. v. Progressive Insurance Group*, the allegations sufficient to constitute tortious interference included "economic coercion and misrepresentations."  928 N.Y.S.2d 199, 206 (N.Y. Sup. Ct. 2011).  And *DiCosomo v. Getzoff*, Spotlight's final citation, involved tortious interference with contract and employment—distinct torts—based on, again, alleged "false and misleading statements and . . . conducting an anonymous and malicious smear campaign solely out of spite and ill-will."  816 N.Y.S.2d 695, at *2 (N.Y. Sup. Ct. 2005).

In sum, wrongful conduct that constitutes tortious interference requires (1) the commission of an independent tort, such as fraud or misrepresentation; (2) conduct taken solely out of malice; or (3) extreme economic pressure.  Spotlight does not allege any false statement that could constitute fraud or misrepresentation, that Daigle acted solely out of malice, or that he exerted economic pressure of any sort.

Accordingly, Daigle's motion to dismiss Count VII is granted.

**IV.    Conclusion**

For the foregoing reasons, Daigle's motion to dismiss the complaint is GRANTED as to Counts II, IV, VI, and VII and DENIED as to Counts I, III, and V.  Daigle shall file an answer to the remaining claims within 14 days after the date of this opinion and order.  *See* Fed. R. Civ. P. 12(a)(4)(A).

The Clerk of Court is directed to close the motion at Docket Number 15.

SO ORDERED.

Dated:  August 28, 2024
         New York, New York

_____
          J. PAUL OETKEN
      United States District Judge